**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **vs.** | : | |
| | : | |
| **RUBEN BORIA** | : | **NO. 07-151-02** |

**M E M O R A N D U M**

PRATTER, J.                                                                MAY 13, 2008

**INTRODUCTION**

     A jury convicted Ruben Boria on January 25, 2008 of one count of conspiracy to possess with intent to distribute 5 kilograms or more of a controlled substance, namely 100 kilograms of cocaine, as well as one count of aiding and abetting the possession of a controlled substance with intent to distribute, all in violation of 21 U.S.C. §§ 846, 841(a)(1) and (6)(1)(A), and 18 U.S.C. § 2.

     The Court now considers Mr. Boria's timely Rule 29 and Rule 33 post-trial motions by which Mr. Boria argues that the Government did not present sufficient evidence from which the jury could properly conclude that Mr. Boria knew the specific objective of the unlawful conspiracy at issue here, or the specific contents of the tractor-trailer at the heart of the drug transportation and delivery scenario here. Having reviewed the transcript of the trial and the parties' written submissions in connection with the defense motions, as well as precedential cases, and after presiding over counsel's oral argument on the defense motions on May 5, 2008, the Court concludes that justice requires that Mr. Boria's Rule 29 motion for judgment of acquittal be granted for the reasons discussed below.[1]

---

[1] Mr. Boria also asks the Court to consider (1) whether the guilty verdicts were against the weight of the evidence so that the Court should invoke Rule 33 to grant a new trial; and (2)

**FACTUAL AND PROCEDURAL BACKGROUND**

The prosecution of Mr. Boria centered upon the transport by tractor-trailer into the

Eastern District of Pennsylvania from Texas of some 100 kilograms of cocaine.  The

Government contended that the shipment implicating Mr. Boria was part of a large-scale drug-

trafficking operation by which drugs were moved from one location to another in commercial

tractor-trailers that appeared to be legitimately transporting fresh produce and other perishable or

non-perishable goods (the "cover" load).  According to the testimony of co-conspirator Noe

Cabrera, sometimes the cover load was a legitimate shipment that would need to be delivered to

an authentic purchaser after the secreted cocaine was off-loaded.  However, on other occasions,

the drug traffickers would merely acquire a decoy cover load for which counterfeit paperwork

would be created, which would then be used as a facade for one or more trips, the sole actual

purpose of which was the movement of drugs.

The cocaine in question here began its journey hidden in the rear of the trailer under

pallets of spoiled produce.  The trailer was padlocked.  Mr. Cabrera hired Marcus Diaz to drive

the shipment in question from McAllen, Texas to Philadelphia.  Mr. Diaz was provided a Boost

mobile phone in order to maintain contact as needed as he made his first deliveries in the

Houston area and then as he approached Philadelphia.  Mr. Cabrera told Mr. Diaz that, upon

arriving in Philadelphia, once he (Mr. Diaz) made contact with the drug organization back in

Houston, he would be told where the drugs were located in the trailer.

---

whether the ruling to exclude from evidence an investigating DEA officer's DEA-6 report was
contrary to Federal Rule of Evidence 803(7) and, if so, whether the exclusion was  harmless.
However, because the Court grants Mr. Boria's Rule 29 motion based upon the insufficiency of
the evidence produced at trial, the Court need not reach the other issues Mr. Boria has raised.

2

Once Mr. Diaz arrived in Philadelphia on or about February 5, 2007, he used the phone to contact Mr. Cabrera who provided Mr. Diaz with another phone number, which turned out to be the phone number for Miguel Morel, to call for specific delivery instructions. Mr. Morel instructed Mr. Diaz to drive to a Home Depot parking lot on Adams Avenue. According to prosecution witness Jose Alvarado (who was then working as a confidential informant for the Government), on February 5, Mr. Morel had contacted Mr. Alvarado seeking his assistance in designating an appropriate garage or warehouse location for unloading the tractor-trailer being driven by Mr. Diaz. Mr. Alvarado testified that he had known Mr. Morel for several years, and previously had helped Mr. Morel in connection with drug-trafficking activities. Mr. Alvarado met Mr. Morel, who was in a mini-van accompanied by three or four other Hispanic males (not including Mr. Boria), and told Mr. Morel that, although he had not been successful in finding a location suitable for unloading the tractor-trailer, the tractor-trailer would be safe overnight at a location near the Frankford Candy Factory. Mr. Alvarado then accompanied Mr. Morel and the other men to the Home Depot location where they met up with the tractor-trailer rig driven by Mr. Diaz. At that point, Mr. Alvarado got into the tractor-trailer with Mr. Diaz and they drove the tractor-trailer to a parking lot at Ashton Road and Grant Avenue. Mr. Alvarado then rejoined Mr. Morel in a car to discuss matters, including Mr. Morel's telling Mr. Alvarado about the nature of drug shipment in the tractor-trailer.

Although Mr. Morel was generally known to be relatively secretive about his illicit activities, he did explain to Mr. Alvarado that Mr. Diaz was to spend the night in the vehicle and that he wanted Mr. Alvarado to watch the tractor-trailer overnight for which he would receive $140,000. Mr. Alvarado testified that he remained in contact with Mr. Morel during the night,

3

but he also contacted law enforcement officials.

Early the next morning Mr. Alvarado returned to the lot where the tractor-trailer and Mr. Diaz had spent the night. He took Mr. Diaz to breakfast at the Nifty Fifties diner. During breakfast, Mr. Alvarado received a call from Mr. Morel. Mr. Alvarado testified that Mr. Morel told him that he had someone waiting with the truck to direct it to a suitable off-loading site. Mr. Alvarado also testified that Mr. Morel told him that "Ruben" was awaiting Mr. Alvarado at the tractor-trailer. It was at that point Mr. Alvarado testified that Mr. Morel told him that "Ruben" was "going to handle the rest of the truck, the rest of the unloading and everything else. . . . [H]e's going to take the driver of the tractor-trailer to finish off what needs to be done inside the truck." (Trial Tr. vol. 2, 131:15-16; 131:21-23, Jan. 23, 2008.) Mr. Alvarado was personally unfamiliar with Mr. Boria, having never met or seen him before.

Mr. Alvarado and Mr. Diaz then left the diner and returned to the tractor-trailer. As they pulled up to the tractor-trailer in the parking lot, a man came over to Mr. Alvarado's car and identified himself as "Ruben." It was the defendant, Mr. Boria. Like Mr. Alvarado, it appears that Mr. Diaz had never before met Mr. Boria. Mr. Alvarado testified that he, speaking Spanish, asked if "Miguel" had sent him, to which Mr. Boria answered affirmatively. Mr. Boria and Mr. Diaz then got into the cab of the tractor-trailer, with Mr. Diaz in the driver's seat. At this point, Mr. Alvarado received another call from Mr. Morel who instructed him to follow the tractor-trailer to make sure that no one was following it. The tractor-trailer pulled into the K-Mart parking lot on Aramingo Avenue. Mr. Alvarado testified that Mr. Morel instructed him to get out of his car and tell Messrs. Diaz and Boria to move the tractor-trailer because it was in a "hot" area for police activity. When Mr. Alvarado approached the tractor-trailer to relay this message,

4

Mr. Boria was in the vehicle's cab using a cell phone.  Once Mr. Boria got off the phone, according to Mr. Alvarado, Mr. Boria said that they would be going to a garage in North Philadelphia and that he was waiting for someone to open up the garage.  Soon after Mr. Alvarado returned to his own car and the tractor-trailer left the K-Mart lot, the police stopped the tractor-trailer, secured the vehicle and took Messrs. Diaz and Boria into custody.  A cell phone and $16.00 was taken from Mr. Boria.

Law enforcement officers had been conducting surveillance of some of the foregoing activities.  Officer Michael Williams testified that on February 6, 2007, he conducted surveillance on the tractor-trailer and shortly after 6:30 a.m. saw Mr. Boria walk up to the driver's side of the vehicle cab and look into the cab.  Officer Williams also testified that he saw Mr. Boria use his cell phone as he walked away from the tractor-trailer and just before approaching Mr. Alvarado's car.  The Officer testified he observed Mr. Diaz get out of Mr. Alvarado's car and into the driver's seat of the tractor-trailer and saw Mr. Boria get into the passenger's side.  Officer Williams explained to the jury that he followed the vehicle and Mr. Alvarado as they drove to the K-Mart at Aramingo Avenue.  Then, once the tractor-trailer was parked at the K-Mart, he saw Mr. Alvarado get out of his car and have a brief conversation with Messrs. Diaz and Boria, following which Officer Williams saw the vehicles begin to leave the parking lot.  The vehicles were stopped by the police very soon thereafter.

A K-9 dog was brought to the scene and "alerted" at the rear doors of the trailer, prompting the successful application for a search warrant.  Upon unlocking the rear trailer doors, Officer Williams saw and smelled that the trailer's fruit cargo was rotten.  Law enforcement personnel unloaded the pallets of produce and eventually located 100 kilograms of cocaine that

had been hidden amidst the fruit. At trial, Officer Williams identified the cell phone that had been seized from Mr. Boria and told the jury that the phone had continued to ring throughout the day during the unloading activities.

Sonia Morales, the mother of Mr. Boria's son, was called by the Government as a witness. She testified that she and Mr. Boria lived together and that Mr. Boria had arrived home at about 3 a.m. on February 6, 2007, and that he had already departed the house by the time she got up later that morning. She testified that she did not know where he went and that when she called him on his cell phone that morning he told her he would call her later. Ms. Morales testified that Mr. Boria did not call her back.

The Government provided documentary evidence concerning incoming and outgoing calls attributed to the cell phone seized from Mr. Boria. During the hour between approximately 6:13 a.m. and 7:13 a.m. on February 6, 2007, Mr. Boria's phone was used to make nine calls to, and receive five calls from, a phone number attributed to Manuel "Manny" Barroso, a man Mr. Alvarado testified he knew to be involved in supplying illegal drugs and who Ms. Morales testified Mr. Boria had referred to as a "cousin."

No evidence was presented to the jury that anyone ever saw Mr. Boria at or near the rear padlocked area of the trailer. No evidence was presented that the back end of the trailer was ever unlocked or opened in Mr. Boria's presence. There was no evidence of any statement to or by Mr. Boria concerning the contraband in the trailer.

At the close of the Government's case-in-chief, Mr. Boria moved for a Rule 29(a) judgment of acquittal. Pursuant to Rule 29(b) the Court reserved ruling on the motion.

The defense called Officer Marilyn Brown as a witness. Officer Brown was the DEA

6

Task Force Officer for this investigation, and she testified that part of her responsibilities was to interact with the Government's confidential informant, Mr. Alvarado. The focus of the defense questioning of Officer Brown was to gain her acknowledgment that the report form on which Officer Brown summarized her activities in this investigation (the "DEA-6"), including her meetings with Mr. Alvarado, did not contain any recitation of Mr. Alvarado having stated to Officer Brown that Mr. Boria would be involved in the actual unloading process. She did confirm during her testimony that her DEA-6 report summary contained no such reference. During his testimony, Mr. Alvarado had testified that Mr. Morel had told him that Mr. Boria was going to assist in the unloading, and Mr. Alvarado also had testified that he had so informed Officer Brown and that Officer Brown was writing notations at the time he conveyed this information. When defense counsel moved for admission of the DEA-6 (in order to demonstrate that, as Officer Brown had testified, no mention was made in the DEA-6 of such a statement by Mr. Alvarado), the Government objected that the document constituted inadmissible hearsay. The Court sustained the objection. While again confirming that "due to an oversight," the report did not so reflect, Officer Brown testified that Mr. Alvarado had told her during a debriefing session that Mr. Boria would be involved in the unloading process.

The defense rested after Officer Brown's testimony. Following closing arguments and the Court's instructions, the jury began its deliberations. During its deliberations, the jury asked by way of a note to see the DEA-6. The Court informed the jury that the document had not been admitted into evidence and, hence, they could not have the document to review, but, after consultation with counsel, the Court also informed the jury that they could consider Officer Brown's testimony about the creation of the DEA-6 and the circumstances of her investigation

7

and activities.

The jury eventually returned a unanimous verdict, finding Mr. Boria guilty on both counts of the Superceding Indictment.

**DISCUSSION**

Mr. Boria moved pursuant to Federal Rule of Criminal Procedure 29(a) for a judgment of acquittal at the close of the Government's case.  He argued at the time that the evidence was insufficient to sustain a conviction on either of the charged counts.  The Court reserved decision on the motion pursuant to Rule 29(b).  Therefore, the Court must "decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).  Mr. Boria renewed his motion for a judgment of acquittal in a post-trial motion.

A claim of insufficiency of the evidence places a heavy burden on Mr. Boria.  In considering a Rule 29 motion, the Court must review the evidence in the light most favorable to the Government.  United States v. McKee, 506 F.3d 225, 232 (3d Cir. 2007).  The Court does not re-weigh the evidence or re-assess witness credibility.  Id. (citing United States v. Peppers, 302 F.3d 120, 126 (3d Cir. 2002)).  Accordingly, the Court must sustain the verdict "'if a rational trier of fact could have found [the] defendant guilty beyond a reasonable doubt, and the verdict is supported by substantial evidence.'" Id. (quoting United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995)).  If there is substantial evidence to support the jury's determination, the Court will "'not disturb the verdict although on that evidence [the Court] might not have made the same decision.'" Id. at 232-33 (quoting United States v. Cooper, 121 F.3d 130, 133 (3d Cir. 1997) (citing United States v. Hannigan, 27 F.3d 890, 892 (3d Cir. 1994))).  Thus, the Court's "inquiry is limited to determining whether the jury's verdict is permissible," id. at 233 (citing United

8

States v. McGill, 964 F.2d 222, 229 (3d Cir. 1992)), and "a finding of insufficiency should 'be confined to cases where the prosecution's failure is clear.'" United States v. Smith, 294 F.3d 473, 477 (3d Cir. 2002) (quoting United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984)). The Court is obliged to refrain from casting itself as a new, one-person jury. Finally, as the Government is at some pains to point out, it has long been the standard in this Circuit that the "evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt." United States v. Allard, 240 F.2d 840, 841 (3d Cir. 1957).

The Superceding Indictment charged Mr. Boria with conspiracy to possess with intent to distribute, and aiding and abetting the possession with intent to distribute, approximately 100 kilograms of cocaine. Criminal liability for conspiracy and for aiding and abetting share the same legal knowledge requirement. See United States v. Cartwright, 359 F.3d 281, 287 (3d Cir. 2004); United States v. Salmon, 944 F.2d 1106, 1113 (3d Cir. 1991). Thus, the Government needed to prove that two or more people in some fashion reached a mutual understanding to attempt to accomplish a common and unlawful plan to possess with intent to distribute a controlled substance and that Mr. Boria, knowing the unlawful purpose of the plan, deliberately joined in it. Circumstantial evidence may provide the entire evidentiary support to prove a conspiracy. United States v. Brodie, 403 F.3d 123, 134 (3d Cir. 2005). It is not necessary that Mr. Boria be shown as knowing all of the plan's details or participants. Id.; see also Blumenthal v. United States, 332 U.S. 539, 557 (1947). However, the Government must prove each element of the offense beyond a reasonable doubt. See United States v. Samuels, 741 F.2d 570, 573 (3d Cir. 1984); United States v. Wexler, 838 F.2d 88, 90 (1988). "One of the requisite elements the

9

government must show in a conspiracy case is that the alleged conspirators shared a 'unity of purpose', the intent to achieve a common goal, and an agreement to work together toward the goal." Wexler, 838 F.2d at 90-91 (quoting United States v. Kates, 508 F.2d 308, 310-11 (3d Cir. 1975) (footnotes omitted)). In the absence of evidence of these essential factors, a guilty verdict on a conspiracy charge cannot be sustained. Id.

Mr. Boria argues that the Government's evidence was not sufficient to prove that he entered into an agreement, and that he had the requisite knowledge and intent charged in the Superceding Indictment, namely, of the purpose of the conspiracy, to transport 100 kilograms of cocaine. Essentially, Mr. Boria argues that the Government failed to prove that he knew the specific contraband contents of the tractor-trailer. Instead, Mr. Boria describes himself as a mere pawn, so much so that the jury should not have concluded that he was aware of the object of the conspiracy.

Mr. Boria notes that in a series of cases the Court of Appeals for the Third Circuit has overturned drug conspiracy convictions because the defendant was not proven to have had knowledge of the illegal objective contemplated by the conspiracy. See, e.g., Cartwright, 359 F.3d at 286;[2] United States v. Idowu, 157 F.3d 265, 270 (3d Cir. 1998);[3] United States v.

---

[2] In Cartwright, the court of appeals found that there was ample evidence that the defendant "knew he was involved in an illicit transaction of some sort," 359 F.3d at 286, but it "conclude[d] that the evidence adduced at trial did not support an inference that [the defendant] knew he was participating in a transaction that involved a controlled substance, as opposed to some other form of contraband." Id. at 283. The court stated:

> There is simply no logical and convincing connection between [the] facts [connecting the defendant to the transaction] and the inference the government seeks to draw. Rather, that inference is based solely on speculation about a possible prior relationship between [the defendant] and [a co-conspirator], about how [the defendant] got to the [location of the transaction], and about what [the defendant] was doing prior to being sighted with [a co-conspirator], matters as to which there

10

Thomas, 114 F.3d 403, 405-06 (1997); Wexler, 838 F.2d at 92; United States v. Coleman, 811 F.2d 804, 808 (3d Cir. 1987); Samuels, 741 F.2d at 573-74; United States v. Molt, 615 F.2d 141, 146 (3d Cir. 1980); United States v. Cooper, 567 F.2d 252, 254-55 (3d Cir. 1977). Mr. Boria argues that the court of appeals has "consistently held in cases of this genre that, even in situations where the defendant knew that he was engaged in illicit activity, and knew that 'some form of contraband' was involved in the scheme in which he was participating, the government is obliged to prove beyond a reasonable doubt that the defendant had knowledge of the particular illegal objective contemplated by the conspiracy." Idowu, 157 F.3d at 266-67. These cases do present a strong array of appellate guidance in support of Mr. Boria here.

In Cooper, supra, the court of appeals overturned a conspiracy conviction in a case that involved a shipment of 1100 pounds of marijuana in a Ryder truck from Boulder, Colorado, to Pottsville, Pennsylvania. The marijuana was stored in the padlocked rear compartment of the

---

is no evidence. Id. at 288.

[3] In Idowu, the court of appeals reversed the conviction because knowledge of "'the specific unlawful purpose charged in the indictment'" had not been established. Idowu, 157 F.3d at 268 (quoting Wexler, 838 F.2d at 91)). In that case there was substantial evidence connecting the defendant to the unlawful activity: the defendant carried a brown leather bag containing the money; he owned the bag, as evidenced by the fact that he kept personal documents in the bag; a co-conspirator left the defendant alone with the money; the co-conspirators believed that it was safe to talk to one another in the presence of the defendant; the defendant showed the co-conspirator the money and directed him to check it to ensure that it was all there; the defendant opened the suitcase to check the contents without being prompted by the co-conspirators; the defendant had $ 3,000 in his pocket at the time he was arrested (which the court presumed he had skimmed from the stash). Id. However, the court determined that all of that evidence only permitted two proper inferences: (1) that the defendant had some kind of preexisting relationship with the co-conspirator; and (2) the defendant knew he was participating in some sort of illegal transaction. Id. However, as to the key issue, the court found that the evidence did not support the inference that the defendant knew the transaction was a drug transaction because "the fact pattern[] . . . [is] consistent with transactions that do not involve drugs of any sort." Id. at 270.

truck. 567 F.2d at 254. For purposes of the appeal, the court of appeals assumed that the government had established that there was a conspiracy between Cooper's co-defendants, Messrs. Meador and Allan, who had conspired to have the marijuana loaded in a Ryder truck rented by Meador and to have the truck driven from Boulder to Pottsville. Id. The government presented evidence that three telephone calls were placed from Allen's residence to Cooper's residence during the week before the Ryder truck departed from Colorado, although no evidence was presented indicating the identity of the participants or the subject matter of the conversation. The government also produced a Colorado motel receipt bearing Cooper's name and the Ryder truck's registration number, and evidence that Cooper and Meador shared a motel room in Pottsville; the trucks' registration number was listed on the motel registration form. One telephone call from the Pottsville motel was made to Cooper's residence. Id.

The court of appeals found that the evidence presented was sufficient to support the inferences that Cooper rode in the Ryder truck with Meador from Colorado to Pennsylvania, and that he shared a hotel room in Colorado with Meador. Id. However, the court found that "there is no evidence that [Cooper] knew what was in the padlocked rear compartment and no evidence that illegal plans were discussed during telephone calls to [Cooper's] home telephone." Id. The court continued: "In the absence of some evidence that he knew of the contents of the locked compartment or some evidence that he engaged in telephone or other communication of a conspiratorial nature, no factfinder could find beyond a reasonable doubt that Cooper was a member of the Allen-Meador conspiracy." Id. at 254-55.

Eleven years later, in Wexler, supra, the court of appeals again overturned a conviction in a case that involved transporting drugs in a rented truck, where the evidence was insufficient to

12

prove that the defendant knew that drugs were located in the truck. In <u>Wexler</u>, the government introduced evidence that Wexler drove a "lookout" vehicle, a white sedan, and engaged in counter-surveillance activities while Kornblith, an unindicted co-conspirator, loaded crates containing hashish into a rented Ryder truck. 838 F.2d at 89-90. Kornblith testified that his role was to accept and deliver the hashish in crates for defendant Bhayana at the direction of defendant Samuels, for whom he previously worked distributing drugs. <u>Id.</u> at 89. The hashish was hidden among Mercedez-Benz engine parts. After Kornblith loaded the truck, and drove it to a Dunkin' Donuts parking lot, agents saw Wexler talking to Samuels near the loaded truck. <u>Id.</u> at 90. The truck was then moved to a K-Mart parking lot. Wexler was observed talking on public phone in the K-Mart store, and later talking to Samuels in front of the K-Mart, while continually looking into the parking area. <u>Id.</u> Wexler and Samuels were then observed in the white sedan conducting continuing counter-surveillance activities. <u>Id.</u> Agents stopped the car and arrested Wexler, who was driving, and Samuels, the sole passenger. The keys to the Ryder truck were found on Samuels. <u>Id.</u> An operational CB radio found in the back of the car was later discovered to have been purchased near Wexler's home by a customer who used a false name and address. <u>Id.</u>

Considering Wexler's appeal, the court of appeals found that:

there is ample circumstantial evidence in this case from which the jury could have concluded that Wexler was involved in a conspiracy with co-defendants Samuels and Bhayana and that the conspiracy involved movement of the cargo of the truck. Wexler drove a car in a manner that suggested he was a "lookout" for the truck movement; he made a motion consistent with signalling Kornblith's arrival at the Dunkin' Donuts store; he spoke with Samuels at various times throughout the operation; and a fictitiously obtained CB radio was in the car he drove when he was arrested.

13

Id. at 91.  However, the court concluded that the government failed to produce "any evidence that

Wexler knew that a controlled substance was couched behind the doors of the Ryder truck."  Id.

The government conceded that there was no evidence that Wexler was told there were drugs in

the truck, no evidence of the subject of Wexler's conversations with Samuels, and no evidence

that Wexler ever had any prior relationship with Samuels.  Id.  The court rejected the

government's argument that "because Samuels arranged that the hashish should be transported by

Kornblith, someone Samuels knew had previously been involved in  drug sales, [the court] must

draw the inference that Samuels also exercised the same care in involving Wexler."  Id. at 91-92.

The court found that:

> [i]t is also more likely than not that Wexler suspected, if not actually knew, that some
> form of contraband was involved in the elaborate secretive arrangements for transport
> in which he participated.  But these permissible inferences do not support a holding
> that the government met its burden to prove beyond a reasonable doubt that Wexler
> knew this was a conspiracy to transport hashish or even another controlled substance.
> The evidence is just as consistent, for example, with a conspiracy to transport stolen
> goods, an entirely different crime.

Id. at 92.

In 1997, in Thomas, supra, the court of appeals again reversed a conspiracy conviction

due to a defendant's lack of "unity of purpose."  In Thomas, Lynch was apprehended and agreed

to cooperate with the government.  114 F.3d at 405-06.  She testified that co-defendant Petersen

had directed her to take a suitcase containing cocaine to Atlanta, check into a room at the Atlanta

Airport Days Inn, call Peterson at a Virgin Islands telephone number, leave the suitcase in the

room, return the key to the front desk in an envelope for "Melvin Smith" or "Cousin Melvin

Smith,'" leave the Days Inn, and return to St. Thomas the following day.  Id. at 404.  Monitored

by the agents, Lynch checked into room 510 of the Airport Days Inn, placed a phone call to

14

Petersen, gave him the hotel room number, and then left an envelope containing the room key at the front desk for "Cousin Melvin Smith." Id.

In due course, Thomas entered room 510. Id. The officers arrested him when he exited the room a few minutes later. Id. They took from Thomas a 9mm pistol registered to him, a pager, a cellular phone, a Virgin Islands driver's license, the envelope with "Cousin Melvin Smith" written on it, and the room key. Id. They retrieved from the pager the same telephone number at which Lynch had called Petersen from the hotel room. Id. Thomas told the agents that he went to the room because a person named Cliff had offered him $500.00 to check on a bag at the hotel, but that he knew nothing about a cocaine deal. Id. at 404-05. Petersen's phone records showed several calls to the pager and cellular phone carried by Thomas on the day of his arrest, and to Thomas' home phone. Id. at 405. Lynch testified, on behalf of the government, that she did not know Thomas, and had not conspired with him to possess cocaine with intent to distribute. Petersen, in his own defense, testified that he did not know Thomas, and that he had not conspired with him to possess cocaine with intent to distribute. Id. Thomas took the stand and also testified that he did not know either Lynch or Petersen, that he had not conspired with them to possess cocaine with intent to distribute, and that he had no knowledge of any such scheme or conspiracy. Id. Thomas testified that on the morning of his arrest he received a phone call from "Cliff," whom he did not know. Cliff informed Thomas that he had obtained Thomas' telephone number from a mutual friend. Cliff asked Thomas if he would do him a favor, and stated that he would call later that day. Later that day, Thomas received a call from his home on his pager. He returned the call to his home and was advised that Cliff was trying to reach him. He told the party answering to have Cliff contact him on his cellular phone. Shortly thereafter,

15

his testimony continued, he received a call from Cliff who asked him to go to the Airport Days
Inn, ask the front desk clerk for a key left for "Cousin Melvin Smith," go to the room, open the
door, close the door without locking it, and return the key to the front desk. Id.

The Thomas court stated that "[t]here can be no doubt that, when Thomas pursued his
errand at the Days Inn, he knew that he was somehow involved in an illicit activity." Id. at 405.
However, the court noted that there was no evidence that Thomas had any prior relationship with
Lynch or Peterson, or even knew them, no evidence of the substance of the telephone calls made
to Thomas's home, cellular phone or pager, and no evidence that Thomas ever spoke with Lynch
or Peterson on the date in question, or any time before or after that date. Id. at 405-06. The court
stated that the government's case "depend[ed] upon the drawing of an inference from the fact and
the timing of the calls made from Petersen's phone that Thomas in fact spoke to Petersen several
times on February 10, 1995 and was told that drugs were in the bag at the Days Inn." Id. at 406.
However, relying on the Wexler line of cases, the court found that this inference was mere
speculation, and that this circuit's conspiracy case law "forbids the upholding of a conviction on
the basis of such speculation." Id.

In Mr. Boria's case, the Government seeks to distinguish the Cooper-Wexler-Thomas line
of cases by arguing that Mr. Boria was connected with Mr. Morel, that he undertook a major role
in the drug activities that occurred on February 6, 2007, i.e., shepherding the tractor-trailer to a
safe location for the expected unloading of the cocaine secreted under the cover load, and that
Mr. Boria's activities on that day otherwise were suspicious. The Government points to Mr.
Alvarado's testimony that Mr. Morel was a well-known drug dealer in Philadelphia, that Mr.
Morel told Mr. Alvarado that "Ruben" would meet Mr. Alvarado where the tractor-trailer was

16

parked on the morning of February 6 to direct the tractor-trailer to a safe place, and that "Ruben" would unload the cocaine from the back of the tractor-trailer. The Government also points to Mr. Boria's telephone records, which indicate a heavy volume of calls both made to and received from Mr. Barroso on the morning of February 6, and to Mr. Alvarado's testimony that he knew Mr. Barroso to be a drug dealer. In addition, the Government relies on Ms. Morales's testimony that Mr. Boria left the house very early in the morning on February 6, and the testimony of law enforcement agents stating that they observed Mr. Boria approach the tractor-trailer early on the morning of February 6, use his cell phone that morning, approach Mr. Alvarado's car, and ride in the passenger's seat while Mr. Diaz drove the tractor-trailer to the K-Mart parking lot, where law enforcement agents seized the vehicle and arrested Messrs. Diaz and Boria.

Certainly, the evidence established that Mr. Diaz and Mr. Morel (with Mr. Alvarado's assistance) conspired to possess with the intent to distribute 100 kilograms of cocaine. Circumstantial evidence also established that Mr. Boria was not a mere bystander on the morning of February 6, 2007. Rather, he took an active role in directing the tractor-trailer to a garage. In addition, the Government produced circumstantial evidence that could permit the inference that Mr. Boria was associated on some level with known drug dealers, namely, Mr. Morel and Mr. Barroso. The Government's circumstantial evidence of Mr. Boria's suspicious activity, together with his negative associations, permits the inference that Mr. Boria knew that he was "somehow involved in illicit activity" on the morning of February 6. Thomas, 114 F.3d at 405. Furthermore, the evidence is sufficient to establish that Mr. Boria met with Mr. Diaz and Mr. Alvarado, and agreed to direct the tractor-trailer to a garage to be unloaded. A jury could conclude that Mr. Boria was involved in a conspiracy with Mr. Diaz and others, "that the

17

conspiracy involved movement of cargo" of the tractor-trailer, Wexler, 838 F.2d at 91, and that

Mr. Boria "suspected, if not actually knew, that some form of contraband was involved in the

elaborate secretive arrangements for transport in which he participated." Id. at 92. However,

missing from this evidence, as in Cooper, Wexler, and Thomas, is any evidence that Mr. Boria

knew that the contraband hidden in palates of rotten fruit in the back of the tractor-trailer was a

controlled substance rather than some other form of contraband. See also Cartwright, 359 F.3d at

287-88; Idowu, 157 F3d at 266.

     In an attempt to distinguish this case from Wexler, where the defendant's role was limited

to a "look-out" engaged in counter-surveillance, or Cooper, where the defendant was a passenger

in a truck loaded with marijuana as it traveled from Colorado to Pennsylvania, the Government

argues that Mr. Boria had a substantial role in the drug enterprise, and that based on his role, in

light of other surrounding circumstances, knowledge may be inferred. However, in these cases,

the court of appeals' decisions did not rest on the particular defendant's level of participation in

the drug activity. In other words, the defendant's "role" was not determinative where

"knowledge" was the key concern.

     Certainly, there can be circumstances where a defendant's assignment or "role" within

the alleged drug conspiracy can provide the knowledge "hook." For example, if a defendant

personally negotiates the purchase or sale of drugs, or personally unloads bricks of cocaine from

a truck, the defendant's knowledge that he was involved in drug activity easily could be inferred.

However, the Government does not identify any principled reason why, absent other

circumstances, knowledge can be inferred if a defendant sits in the passenger seat of a truck and

directs it to its destination, as in this case, but cannot be inferred if a defendant serves as a "look-

out" while criminal activity is ongoing, as in <u>Wexler</u>.

The determinative issue in our court of appeals' drug conspiracy jurisprudence is whether the defendant knew that the object of the conspiracy was to possess a controlled substance with the intent to distribute. In <u>Wexler</u>, the court of appeals noted that the defendant participated in "elaborate secretive arrangements for transport" of the drugs, and was actively engaged in continuous counter-surveillance measures. The court of appeals found that there was sufficient circumstantial evidence from which the jury could have concluded that the defendant was involved in a conspiracy with the co-defendants, and that the conspiracy involved movement of the cargo of the truck. 838 F.2d at 91. The court of appeals did not reject Wexler's conviction because his role was too minimal; they mandated his acquittal because there was an insufficient nexus between the defendant and the specific object of the conspiracy.[4]

Looking at the evidence dispassionately, the same is true here. The Government did not

---

[4] Moreover, certain similarities between the role of a "look-out," a driver or, as Mr. Boria's counsel described his role here during oral argument, a "human GPS-navigation device," suggest that inferring "knowledge" under the circumstances presented here is mere speculation. For example, in <u>Wexler</u> and <u>Cartwright</u>, the defendants never owned, possessed, touched or even saw the drugs at issue. (The same was true in <u>Cooper</u> and <u>Thomas</u>, where the defendants played a role in transporting and receiving shipments of contraband, respectively.) Instead, the defendants in those cases, like Mr. Boria, performed discrete functions that were part – indeed, possibly an essential part – of a larger enterprise. However, it was the respective defendants' lack of knowledge that insulated them from the sharing the "unity of purpose" of the conspiracy.

In this case, the Government points to Mr. Alvarado's testimony that Mr. Morel was very secretive, he only dispensed information on a "need-to-know" basis, and he often used people like Mr. Alvarado and Mr. Boria to perform certain tasks. The Government encourages the Court to infer that Mr. Boria knew that his role was to direct the truck, but also to infer that Mr. Boria knew that he was performing a certain role within a larger conspiracy to possess and distribute controlled substances. However, this evidence cuts against the Government's arguments here because if Mr. Morel indeed was secretive, it follows that he only may have provided Mr. Boria with certain details about his "role" and precise responsibilities, and may have withheld from Mr. Boria certain other details, such as the contents of the tractor-trailer.

19

produce any direct evidence that Mr. Boria ever was told or even was present while discussed that the tractor-trailer contained cocaine. The circumstantial evidence the Government did produce does not support the inference that Mr. Boria knew the object of the conspiracy. The Government relies on Mr. Alvarado's testimony that Mr. Morel was a "known" drug dealer, and Mr. Boria's alleged statement that "Miguel" sent him to direct and unload the truck. However, while Mr. Alvarado's testimony may establish that he (Mr. Alvarado) knew that Mr. Morel was a drug dealer, it does not establish that Mr. Boria knew that Mr. Morel was a drug dealer. There is no evidence of any communication between Mr. Morel and Mr. Boria prior to February 6, 2007, nor was there evidence of any direct communication between them during the activity that occurred on that date. While Mr. Alvarado was in constant contact with Mr. Morel on that morning, there is no evidence that Mr. Morel contacted Mr. Boria on or about that date, or vice versa. In addition, Mr. Boria's acknowledgment that "Miguel" sent him to direct the tractor-trailer is the only evidence that possibly links Mr. Boria to Mr. Morel. Mr. Boria's contact with Mr. Diaz or Mr. Alvarado does not provide any evidentiary link to the subject of the conspiracy. Neither Mr. Morel nor Mr. Diaz testified in this case. As in Thomas, the Government did not present any evidence here that Mr. Boria had any prior relationships with Messrs. Morel, Diaz or Alvarado, all of whom, according to the evidence presented, were active in the drug trade. There was no evidence presented that Mr. Diaz had met or spoken with Mr. Boria prior to February 6. Mr. Alvarado testified that he had known Mr. Morel for nine years, and that Mr. Morel had been engaged in the drug trade throughout that period, yet Mr. Alvarado had never met, seen, heard of, or spoken to Mr. Boria prior to February 6.

The Government emphasizes Mr. Boria's heavy cell phone use during the hour of 6:13

a.m. to 7:13 a.m. on February 6, and notes that all of these calls were made to, or received from, a number subscribed to by Mr. Barroso, whom Mr. Alvarado also knew to be a drug dealer. Again, however, no evidence was presented indicating that <u>Mr. Boria</u> (as opposed to Mr. Alvarado) knew that Mr. Barroso was a drug dealer.[5]  Moreover, the Government did not produce any evidence that Mr. Barroso was in any way involved with the drug activity on February 6, 2007.[6]  Aside from Mr. Boria's telephone records, no evidence was presented liking Mr. Barroso himself to the event of February 6, 2007.  No evidence was presented that Mr. Boria actually spoke to Mr. Barroso on that date (as opposed to someone else who may have been using Mr. Barroso's cellular phone), and no evidence was presented as to the substance of the 14 calls made or received by Mr. Boria on February 6.[7]  The <u>Cooper</u> court refused to assume that Cooper and his co-conspirator discussed the object of the conspiracy during the course of a cross-country

---

[5] The only evidence presented that could potentially bear on Mr. Boria's knowledge of or about Mr. Barroso was Ms. Morales's testimony that Mr. Boria knew Mr. Barroso, and that he typically referred to Mr. Barroso as "cousin."

[6] The only testimony Mr. Alvarado provided with respect to Mr. Barroso was that he recognized his picture as someone he had met through other people he hangs around with, and that "to my information, he supplies people with drugs." (Trial Tr. vol. 2, 120:16-24, Jan. 23, 2008.) Mr. Alvarado did not testify that Mr. Barroso was in any way connected with the drug activity that occurred on February 6, 2007.

[7] There is one potential exception to this conclusion concerning the phone calls. Mr. Alvarado testified that when he approached the tractor-trailer after it had reached the K-Mart parking lot, Mr. Boria was talking on his cellular phone. Mr. Alvarado testified that after Mr. Boria hung up, Mr. Boria informed Mr. Alvarado that he was directing the truck to a garage in North Philadelphia and that he was waiting for somebody to unlock that garage. However, there was no testimony that the call concerned the garage arrangements and Mr. Alvarado's testimony only permits the inference that Mr. Boria spoke to some unidentified individual (who may or may not have been Mr. Barroso) about where to direct the truck. The Government did not link this testimony to any particular call reflected on the list of Mr. Boria's incoming and outgoing calls. In any case, this testimony did not provide any link to the contraband hidden in the back of the trailer.

21

drive from Colorado to Pennsylvania, during which they shared at least two motel rooms. Certainly no assumptions can be made about any conversations Mr. Boria may have had with Mr. Diaz while the two men drove in the tractor-trailer together for less than an hour in the very early morning, or about Mr. Boria's early morning telephone calls.

The Government relies on a single precedential case, United States v. Iafelice, 978 F.2d 92 (1992), in support of its argument that the evidence it presented in this case is sufficient to sustain a conviction for conspiracy. However, critical differences distinguish Iafelice from Mr. Boria's situation. First, as presented to the court of appeals, Iafelice was a possession case and not a conspiracy case.[8] The Iafelice court's inquiry was

> whether there was sufficient evidence to conclude that Iafelice had constructive possession of the drugs, and whether he had an intent to distribute those drugs. Constructive possession exists if an individual "knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons." United States v. Blackston, 940 F.2d 877, 883 (3d Cir. 1991) (quoting Black's Law Dictionary 1047 (5th ed. 1979)). Constructive possession necessarily requires both "dominion and control" over an object and knowledge of that object's existence.

Id. at 96. Secondly, two facts in particular distinguished Iafelice from its precedents, including Wexler, where evidence of the defendant's knowledge was found to be lacking: "(1) the presence and use of a beeper and telephone during the drug transaction, and (2) the undisputed presence of the drugs in Iafelice's car." Id.

The Government seizes on the Iafelice court's focus on items such as beepers and telephones used during the drug transactions, and emphasizes Mr. Boria's use of a cellular

---

[8] While Iafelice was charged with conspiracy in addition to possession of a controlled substance, the jury acquitted Iafelice of the conspiracy charge, and convicted him only of the possession charge, which was the subject of the appeal. Iafelice, 978 F.2d at 95.

telephone.  However, Mr. Boria's use of a cell phone is consistent with transporting numerous forms of illegal contraband, not to mention entirely legal activity.  As discussed above, absent other evidence, especially evidence of the substance of telephone conversations, use of a cell phone early in the morning does not permit the inference of knowledge the Government seeks to attribute to Mr. Boria.

Of greater significance here, the Iafelice court stated that "[t]he truly distinguishing fact is Iafelice's ownership and operation of the vehicle used to transport the drugs.  Ownership and operation of the car are highly relevant facts that could reasonably have been considered by a jury in evaluating [Iafelice's] knowledge of, and dominion and control over, the drugs."  Id. at 97. The court found that this evidence was what made the totality of the evidence sufficient to prove that Iafelice "constructively possessed" the contraband.  Accordingly, the court sustained Iafelice's conviction.

The "crucial" fact in Iafelice, namely, that the drugs were transported in a car owned and operated by the defendant, is not present in this case.[9]  However, the Government argues that

---

[9] During oral argument on Mr. Boria's motion, counsel for the Government referred the Court to one additional, unpublished case from the Third Circuit Court of Appeals, United States v. Yongo, 102 Fed. App'x 260, 263 (3d Cir. 2004) (unpublished), which, according to counsel, supports its position here.  However, Yongo is distinguishable for the essentially the same reason as Iafelice, namely, the element of "ownership" was present there but is missing here.  In Yongo, the defendant attempted to enter the United States from Kenya through Philadelphia International Airport.  Upon arrival, Yongo presented for customs inspection a briefcase and suitcase, which he claimed belonged to, and had been packed by, him.  Id. at 261.  The briefcase contained small wooden carvings wrapped in newspaper, which he declared had a total value of $520 in the United States.  Id. at 261-62.  Customs officials further found that the defendant's briefcase contained a false lid, and after the briefcase was drilled, customs officials found 1501 grams of heroine concealed in the false lid.  The court of appeals found that the evidence was sufficient to sustain Yongo's conviction for importing more than one kilogram of heroin into the United States in violation of 21 U.S.C.S. § 952(a).  The court noted emphasized the "significance of ownership" in assessing whether a defendant knew that he was transporting drugs, and

23

because Mr. Boria directed the movement of the tractor-trailer through the streets of

Philadelphia, he exercised "dominion or control" over and, essentially, "owned" the truck. This

argument is not persuasive. The evidence here firmly established that Mr. Boria's first contact

with the tractor-trailer used to transport 100 kilograms of cocaine was during the early morning

hours of February 6, 2007, the same day that he was arrested. There was no evidence that Mr.

Boria ever drove or possessed keys to the tractor-trailer, or that the trailer was ever unlocked or

opened in Mr. Boria's presence. At all times during the morning of February 6, Mr. Diaz

possessed the keys to and drove the tractor-trailer, and for a period of a few minutes, Mr. Boria

directed Mr. Diaz where to drive. At all times Mr. Boria was a passenger. This evidence does

not support the inference that Mr. Boria "owned" or otherwise "controlled" or "possessed" the

tractor-trailer such that his knowledge of its contents should be inferred.

## CONCLUSION

The Government's case amounts to relying on the inference that because Mr. Boria may

have kept bad company, i.e., people involved in the drug trade, he must have known that on the

morning of February 6, 2007, the padlocked tractor-trailer he was riding in contained cocaine or

other illegal drugs. However, "[t]he inferences rising from 'keeping bad company' are not

enough to convict a defendant for conspiracy." Wexler, 838 F.2d at 91 (citing Cooper, 567 F.2d

at 255 ("One may not be convicted of conspiracy solely for keeping bad company.")). Although

---

specifically noted, as the government pointed out in that case, that "the fact of ownership"
distinguished Yongo from other cases, notably, Wexler. Id. at 263 n.3. In Yongo, the defendant
admitted that he packed and owned the suitcase and its contents. The court also found that the
conclusion that Yongo had knowledge of the drugs "was bolstered by the surrounding
circumstances, including Yongo's demeanor during the inspection, the relative value of the
statues as compared to the cost of the plane ticket, and Yongo's not particularly believable
revised statements regarding the purpose of his trip." Id. at 263.

it could be said that this is a close case, considering all of the evidence, together with inferences examined in the light most favorable to the Government, in the final analysis there is insufficient evidence to conclude with the necessary confidence, i.e., beyond a reasonable doubt, that Mr. Boria possessed the requisite knowledge or shared the "unity of purpose" of the conspiracy. In sum, there was no evidence that Mr. Boria was engaged in, or present during, any conversations about the cocaine that was hidden in the back of the trailer; no probative evidence of the substance of any communications in which Mr. Boria engaged; no evidence that Mr. Boria ever "possessed" or saw the cocaine, or that he ever saw the back of the trailer unlocked; no evidence of any prior relationship between Mr. Boria and any co-conspirators; and no evidence that Mr. Boria previously had been involved in any drug-trafficking activities, let alone activities of the type at the heart of this investigation and prosecution. Accordingly, the Court finds that a reasonable jury could not find that Mr. Boria knew the actual purpose of the conspiracy as coming to fruition early on February 6, 2007. Therefore, a judgment of acquittal will be entered for Mr. Boria with respect to both offenses charged in the Superceding Indictment.

25

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :     **CRIMINAL ACTION**

               **vs.**             :

**RUBEN BORIA**             :      **NO.  07-151-02**

## O R D E R

AND NOW, this _13th_ day of May, 2008, upon consideration of Mr. Boria's Rule 29

Motion for Judgment of Acquittal (Docket No. 64), his renewed Rule 29 motion and Rule 33

motion (Docket No. 85), the Government's omnibus response thereto (Docket No. 86), and Mr.

Boria's supplemental memorandum (Docket No. 92), for the reasons discussed in the

accompanying Memorandum, **IT IS ORDERED** that Mr. Boria's Rule 29 Motion (Docket Nos.

64, 85) is **GRANTED**, and the Clerk of Court will enter a **JUDGMENT OF ACQUITTAL** for

Mr. Boria with respect to both Counts of the Superceding Indictment (Docket No. 20) in this

action.

BY THE COURT:

GENE E.K. PRATTER
United States District Judge